## In re BLAIR'S WILL.

(*Common Pleas of New York City and County, Trial Term.* April 20, 1891.)

1. WILLS—TESTAMENTARY CAPACITY—"SOUND MIND AND MEMORY."
   The "sound mind and memory" which the law exacts as a condition of testamentary competency means that the testator must be able to recollect the objects of his bounty and the particulars of the property he is about to bequeath, to grasp the provisions of the paper he is executing, and to form a rational judgment of the transaction in which he is engaged.

2. SAME—UNDUE INFLUENCE.
   Undue influence is such influence as suppresses the independent volition of the testator, and constrains him to give expression to the will of another instead of his own.

3. SAME—CIRCUMSTANTIAL EVIDENCE.
   The fact of undue influence need not be proved by direct evidence, but may be inferred from circumstances.

4. SAME—DECLARED INTENTION OF TESTATOR.
   A discrepancy between the testator's declared intention and the provisions of the will raises a presumption that the will does not speak the mind of the testator.

5. SAME—UNNATURAL WILL.
   If the testamentary dispositions are unnatural or unjust, there is an indication of undue influence.

6. SAME—SECRET EXECUTION.
   Exclusion of the heirs from any knowledge of the will-making may be evidence of undue influence.

7. SAME—CONFIDENTIAL RELATIONS OF BENEFICIARY.
   The fact that a beneficiary under the will stood in a confidential relation to the testator, or that such beneficiary had any agency in making the will, may be evidence of undue influence.

Application for the probate of the alleged last will of William T. Blair, deceased. The probate was opposed by Sarah Catherine Blair. On his own motion, the surrogate transferred the proceedings to the court of common pleas, where the jury found against the validity of the will. Pending appeal, an application was made to the surrogate's court by the contestant for the appointment of a temporary administrator, which application was denied, and an appeal taken to the general term, whose opinion therein is reported in 15 N. Y. Supp. 212.

*B. Wright,* for proponent.    *E. T. Wood,* for contestant.

PRYOR, J., (*charging jury.*)  Three questions are submitted to your determination:  *First.* Was the paper propounded as the last will and testament of William T. Blair, deceased, executed in conformity with the provisions of the statute?  *Second.* Had he testamentary capacity at the time of the execution of the instrument?  *Third.* Was the instrument his own voluntary act, or was it the product of undue influence?

The solution of these questions is for you, and you alone. You must determine the credibility of witnesses; you must estimate the weight of conflicting evidence; you must ascertain what facts are established by the evidence; you must deduce all inferences from the established facts. My province is only to instruct you as to the rules of law which should guide your deliberations. Your verdict must necessarily be compounded of law and fact, and, while the facts are exclusively for your decision, you must accept the law as it shall be delivered to you by the court.

The law has prescribed certain formalities in the execution of a will, and has made the due observance of them indispensable to the validity of a testamentary paper. The first requisite is that the paper be subscribed by the testator in the presence of the attesting witnesses. This fact being established by uncontroverted evidence, you must find that the paper was subscribed by the testator in due compliance with the legal prescription. The second req-

uisite is that each of the attesting witnesses must sign his name at the end of the paper; and, this fact also being proved without contradiction, you must find accordingly. The third requisite is that the testator, at the time of his subscription, must, in the presence of the witness, declare the instrument to be his will. Upon this point I charge you that the evidence so conclusively establishes the due publication of the will that you must accept it as an uncontroverted fact in the case. The fourth requisite is that each witness must sign his name at the request of the testator; and I charge you that this condition, too, is so conclusively established that you must accept it as an uncontroverted fact in the case. But there is a fifth and final requisite to the due execution of a testamentary paper, namely, the subscription of the will by the testator must precede the signing by the witnesses, unless he subsequently acknowledge his subscription in their presence. Of such subsequent acknowledgment there is no evidence in the case, and so the question is whether the testator subscribed the paper before or after it was signed by the witnesses. And this, gentlemen, is the only question before you touching the due execution of the paper in controversy. One of the attesting witnesses, Dr. Hawes, said quite positively that he signed before the testator, and that he thought both the witnesses signed before the testator; but the other witness and Mr. Zittel swore unequivocally that the testator had subscribed the paper when the witness signed it. It is for you to say how the fact is,—whether the testator signed before or after the witnesses. If you find that the testator signed the paper before the witnesses, you will answer "Yes" to the first interrogatory; if you find that the testator signed after the witnesses, you will answer "No" to that interrogatory. But, in submitting this question to you for your decision, it is my right and my duty to say that, in the opinion of the court, the clear weight of evidence is that the testator signed the paper before the witnesses. Still the question is for your arbitrament.

Before proceeding to instruct you upon the other issues submitted for your determination, I would impress you with the importance of two considerations. The first is that every man of legal competency has the right to dispose of his property by will. This right the law gives him, and, if the right be legally exercised, no person whatever can challenge or defeat it. The accumulation of property, which, by his own industry and frugality, a man has made, he may distribute at his death according to his own good pleasure; and, provided his testamentary dispositions be in conformity with law, they are final and irreversible. The second consideration is involved in the first, and it is that, when a man has made a valid will, neither court nor jury, nor both combined, can defeat or disturb its intended operation. If the will be legal, neither court nor jury has the authority to pass upon its wisdom or justice, or to redress its supposed follies or inequalities. No matter how flagrantly a testator has violated the obligations of affection or friendship, no matter how grievous the disappointment of husband or wife, or of son or daughter, his will, if valid, must stand, and his moral delinquencies must be left to the cognizance of that higher tribunal before which he has already appeared.

It is submitted to you to determine whether the testator was competent to make a will. In order to testamentary capacity, the statutes require "a sound mind and memory." But these terms are not to be taken in their literal and absolute sense. The "sound mind and memory" which the law exacts as a condition of testamentary competency does not mean a mind without flaw, or a memory without fault. To require such an ideal mind and memory would be a virtual denial of the power to make a will, because imposing a condition incompatible with human infirmity. Neither is it requisite to testamentary capacity that the mind and memory be of the ordinary or average standard of the human intellect. Nor yet is a mind, weakened and disordered by age and bodily maladies, necessarily incompetent to the testament-

·ary act; for such a mind may still possess the intelligence and integrity which the law adjudges to be sufficient. What, then, gentlemen, is that measure of mental strength and soundness which the law prescribes as a requisite and as adequate to the performance of the testamentary act? I give you the answer in the language of the highest court in the state: "It is essential that the testator has sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were, or should, or might have been, the objects of his bounty, and the scope and meaning of the provisions of his will. He must have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive, at least, their obvious relations to each other, and be able to form some rational judgment in reference to them. A testator who has sufficient mental power to do these things is, within the meaning and intent of the statute of wills, a person of sound mind and memory, and is competent to dispose of his estate by will." This, gentlemen, is the legal standard and criterion of testamentary capacity; and by this standard and criterion, and this standard and criterion alone, you are to determine the competency of William T. Blair to make this will. If you find that, at the time he executed the instrument in controversy, he had the mental power indicated by this standard,—no matter how aged and infirm he was,—your answer to the second interrogatory must be in the affirmative. On the other hand, if you believe that he had not that measure of mental power,—and, in solving the question, you may consider his age and infirmity,—if, upon all the evidence, you find that he had not that measure of mental power, your answer must be in the negative.

But, although a man have legal capacity to make a will, still the will may not be the act of his own independent volition, but may'be the involuntary effect of undue influence, and whether the paper in controversy be the product of undue influence is submitted for your decision. Obviously, you cannot determine whether the testator executed the paper under the pressure of undue influence, unless you know what is "undue influence." This is a legal term, and you must understand and apply it in the sense which the law attaches to it. The expression is not "influence" simply, but "undue influence." What, then, is the legal conception and definition of "undue influence?" I charge you, gentlemen, that as, on the one hand, undue influence does not necessarily involve physical force, constraint, or violence, so, on the other hand, undue influence implies something more than mere advice, argument, or persuasion. Advice, argument, and persuasion, if they convince the reason and move the affections only,—leaving the will still free and unfettered,— are not undue influence. Influence they are, certainly, but not undue influence. But even advice, argument, and persuasion, if they be so importunate and persistent, or otherwise so operate, as to subdue and subordinate the will of the testator to the will of another, till the testamentary instrument speak not his own mind and his own purpose, but the wish and purpose of another,— such advice, argument, and persuasion, so operating and with such effect, are undue influence. To be undue influence, the influence must amount to moral coercion, but if it amount to moral coercion it is undue influence, no matter how or by what instrumentalities produced. The human mind is so fearfully and wonderfully made; is open and amenable to such a diversity of influences; the mind of one man so differs from the mind of another; the influences which sway the mind of one man are so different from the influences which sway the mind of another; and the moving springs of mental operation are so veiled from observation,—that it is impossible to know all the considerations that are compulsive upon the human will, or to measure exactly the precise force of any particular motive in determining human action.

It results, therefore, that although, in order to find the fact of undue influence in the production of the paper in controversy, you must be satisfied that undue influence was actually exerted over the testator in the testamentary

act, yet to the finding of that fact it is not necessary that you should know what particular agencies were employed to overcome the free will of the testator; and, while you may not find the fact of undue influence upon mere suspicion or surmise, yet it is not necessary that you be able to lay your finger on any particular act of undue influence exerted over the testator. It is enough if, upon all the evidence, you are convinced that the paper does not speak the true and voluntary purpose of the maker.   To recapitulate:  If a person be persuaded, by appeals to his reason, his affection, or his sense of duty, to make a will contrary to what he contemplated, yet, if the act be the legitimate result of such persuasion, acting upon his untrammeled judgment, it is not an unlawful persuasion, and the will is not the effect of his surrender of free agency.   If, however, such a persuasive appeal be made to a person of too feeble a mind to resist, or to one who, from physical or mental weakness, is incapable of withstanding or repelling the importunity, such persuasion or importunity would be undue influence, because it overpowered and controlled the will of the testator, and his act became but the expression of the volition of another.

As already intimated to you, gentlemen, it is not necessary that the fact of undue influence be proved by direct evidence.   Indeed, as you must perceive, the fact in its very nature is to be inferred rather from circumstances,—from the surroundings of the testator, the character of the will, his family and social relations, the condition of his health and mind, his dependency upon subjection to the control of the person supposed to have wielded the influence, the opportunity and disposition of that person to wield it, and the acts and declarations of such person.   Each case must be determined according to its own peculiar facts and circumstances, having in view the simple principle that no instrument can be established as a will unless it speak the free and voluntary purpose of the testator.   If it be the will of another, to which the testator assented from mere habit, produced by prostration of body and mind and a sense of helpless dependence, then it is not his will, and should be rejected as the product of undue influence.

There are certain facts and circumstances, gentlemen, which the law recognizes as indicative of the presence or absence of undue influence, as evidence of undue influence or the contrary,—evidence the weight of which, however, you are to determine.   On the one hand, if the instrument express the known and declared purpose of the testator, the presumption is that it is the emanation of his own untrammeled volition.   But I am bound to say to you that here is no evidence that, prior to the execution of the instrument, the decedent intended to make such a disposition of his property as is contained in the paper before you.   In the next place, if the testamentary disposition runs along the line of affection,—is in harmony with the mental inclination of the testator,— that is a circumstances of importance to identify the instrument as an authentic expression of his wish and purpose.   But I recall no evidence in the case indicating such an indifference towards the contestant on the part of the testator as would make probable the small and precarious provisions for her support contained in the paper before you.   The provision for her is not only slight in relation to the value of his estate, but may be altogether illusory; for, as the contestant is to enjoy the $1,000 a year only until she reaches the age of 25, and is not to receive it at all before the death of her grandmother, it is quite obvious that, as the grandmother may not die until after the contestant has arrived at the age of 25, she may never receive a penny of the provision.   Now, the contestant was the only surviving representative of the testator's name and blood,—sole daughter of his house and heart,—and this is all the provision he makes for her.   It may be that this was precisely the provision he intended for her, and that for reasons unknown to us, but satisfactory to himself, he purposely chose to mock her with a benefit that might be Dead-Sea fruit on her lips.   But this delusive provision for his

granddaughter may have been imposed upon the testator, contrary to his will, by an alien influence. What the fact is it is for you to say upon the evidence. Again, the fact, if it be such, that the instrument was drawn in conformity with the instructions of the testator, and that he subsequently expressed his satisfaction with it, is strong evidence in disproof of undue influence. But you are to consider that instructions for a will may be the dictate of the undue influence which presides over its execution, and that the same undue influence may prompt the expression of satisfaction with the instrument. Hence neither prior instructions nor subsequent recognition are incompatible with the presence and prevalence of undue influence in the concoction of the paper. The draughtsman of this will testified that he got his instructions from the testator; but what those instructions were, and whether the will conforms to them, he did not tell you. Moreover, you are to remember that the draughtsman was engaged by the man to whom the undue influence is imputed, that he was present when the instructions were given, and that his were the hands by which both the first draft and the perfected instrument were conveyed to the testator. And, as to the testator's expression of satisfaction with the instrument, you will recollect that that, too, was in the presence of the chief beneficiary and the man charged with the undue influence, and in their presence alone. Recalling these and all other circumstances bearing on the facts, it is for you to measure the weight due to the prior instructions and subsequent recognition, in disproof of the allegation of undue influence.

On the other hand, as there are circumstances which the law recognizes as indicating the absence of undue influence, so there are circumstances which the law recognizes as indicating the presence of undue influence in the testamentary act. While age and infirmity are not, of themselves, evidence of undue influence, yet the physical and mental weakness of the testator at the time of the testamentary act is an important circumstance for your consideration, because it is a fact of universal observation that the strength of the will depends largely upon the bodily condition, and we know that a pressure that would weigh as light as a feather upon a robust and vigorous constitution might be irresistible to a mind exhausted by sickness and suffering. As a consistency between declared testamentary intention and the provisions of a will affords a strong presumption that the will speaks the mind of the testator, so, conversely, a discrepancy between declared intention and the provisions of the will raises a presumption, more or less strong, that the will does not speak the mind of the testator. But this presumption may be overcome by evidence that the provisions of the will are nevertheless the dictate of the independent volition of the testator. Now, it is an uncontroverted fact that by a previous will this testator had made liberal provision for his granddaughter,—a provision which contrasts glaringly with the meager provision in the paper before you. You have heard the explanation given for the proponents of this change in the testamentary intention of the decedent, and it is for you to say whether the change is satisfactorily accounted for,—whether the change authorizes any inference of undue influence in the procurement of the paper before you.

If the testamentary dispositions be unnatural or unjust, that circumstance may be indicative of undue influence. It is for you to say whether the dispositions in the paper before you be unnatural and unjust, and whether they authorize an inference of undue influence.

Clandestinity, in the execution of a will,—that is, exclusion of heirs from any knowledge of the will-making,—may be significant of some sinister interest in the concoction of the will. It does not appear that the contestant ever had any intimation of the preparation of this paper; but it does appear that when Zittel came to read it to the testator and the chief beneficiary under it, the doors and windows were closed. It is for you to say what, if any, inference of undue influence you will deduce from this circumstance.

The fact that a beneficiary stands in a confidential relation to the testator —much more if the beneficiary have any agency in making the will—may be evidence of undue influence. Mr. Zittel was the confidential friend and constant companion of the testator. Mr. Zittel, though not a legatee or devisee under the will, is an executor, and an executor whom the testator expressly exempts from security for the faithful discharge of his official duties. Mr. Zittel derives a pecuniary advantage from his position as executor. Now, it was Mr. Zittel who procured Thurston to draw the first will. It was Zittel who procured Mr. Wright to draw this will. The will was drawn at Mr. Zittel's house. It was drawn by a lawyer, who had had professional relations with Mr. Zittel, and whom it does not appear that the testator knew. Wright gave the first draft to Zittel, and Zittel took it to the testator. Wright gave the perfected draft to Zittel, and Zittel took it to the testator. Zittel was present when Wright got his instructions for the will from the testator, but he says he did not hear them. Zittel took Van Gassbeck to witness the will. Zittel got Mills to be co-executor of the will. After the will was executed, Zittel took it and kept it until the death of the testator. For about three weeks before the will was executed, Zittel was talking to the testator about it. Finally, Zittel suggested a provision in the will, and the testator adopted it. Such, gentlemen, was the active agency of Mr. Zittel in the preparation of the paper before you. And yet he may not have exerted any undue influence upon the testator. His entire connection with the transaction may have been due to the promptings of disinterested friendship, and may have operated within the limits of legitimate suggestion. Or, Mr. Zittel may have brought undue influence to bear upon the testator. What the fact is it is for you to say.

The principal beneficiary of the will is the testator's widow. Dr. Hawes says that before he would witness the will he asked the testator if it was satisfactory to his wife. In response to an inquiry why he so asked, he replied that it was because of a controversy between them. Here, then, was a controversy between the testator and his wife. What was that controversy? Did the wife wish the testator to abandon some testamentary intention that he entertained? And, if so, did she confine her solicitations to legitimate persuasion, or did she pursue her purpose within the region of undue influence? That the testator was anxious that the will should satisfy his wife is plainly apparent. He told Dr. Hawes that he had read the will to her, and that she assented to it. When the will was read by Zittel to her and the testator she said it was satisfactory. It was natural and proper that the testator should desire to satisfy his wife, and her solicitude about the will and his desire to please her by its provisions are of no weight against the validity of the will, unless out of them came some effort to mould the will in her interest which amounted to undue influence.

It is my duty now, gentlemen, to direct your attention to a piece of evidence which, according as you may view it, is of great or is of no importance in the decision of the case. The contestant produced a petition for the revocation of the probate of the will signed by the widow of the testator. In that petition she declared, under oath, that the testator was incapable of making a will, and that it was procured from him by undue influence. Mrs. Blair knew perfectly well the mental condition of her husband, and she was in a situation to be cognizant of any undue influence upon him. Her representation of these facts was clearly and essentially against her interest. Now, the law recognizes declarations against interest as a cogent species of evidence. But Mrs. Blair denies these declarations. She says the paper was fraudulently imposed upon her; that she believed she was signing a petition to compel the executors to give bond for their faithful conduct; that she never knowingly made the declarations now imputed to her. If her story be true, not only does her signature of the petition weigh nothing against the will, but,

on the contrary, it tells heavily against the contestant, for the contestant procured the notary to certify this alleged fraudulent paper. But Mrs. Blair's story is contradicted. Mr. Wood, the lawyer, who drafted the petition, swears that he drew it under her instructions; that he read it to her in the presence of her daughter-in-law and her granddaughter; that he explained to her what the effect of the proceeding initiated by the petition would be upon her interest under the will; that he left the petition with her, and that it was returned to him, signed, sworn to, and certified by the notary. The notary testifies that, in reply to inquiry by him, Mrs. Blair said she knew the contents of the petition, and that they were true. Which of these stories is the fact? Gentlemen, it is for you to say. The witnesses to the will testify that, at the time of its execution, the testator was capable of making a will. A number of persons who had known the testator for years, and who have no apparent interest to falsify the fact, testify to his mental competency, even after the execution of the will. On the contrary, other witnesses, apparently disinterested, impugn his testamentary capacity. The uncontroverted evidence shows him to have been, at the time of the execution of the paper before you, in a condition of mental and physical debility. But mental and physical debility alone do not incapacitate a man to make a will. To be incapable of making a will, a man must be in a condition which disables him to recollect the objects of his bounty, and the particulars of the property he is about to bequeath, to grasp the provisions of the paper he is executing, and to form a rational judgment of the transaction in which he is engaged. Unless the testator was in that condition, unless he was able to recollect the object of his bounty and the particulars of his property, to understand the provisions of the will, and to exercise a rational judgment in the transaction, he was not of testamentary capacity, and you must answer "No" to the second interrogatory. If he was in that condition, if he was able to recollect the objects of his bounty and the particulars of his property, to understand the provisions of the will, and to exercise a rational judgment in the transaction, then he was of testamentary capacity, and your answer to the second interrogatory must be in the affirmative. Undue influence is such influence as suppresses the independent volition of a testator, as destroys his free agency, and constrains him to give expression to the will of another instead of his own. If, upon all the evidence, you believe the paper before you embodies the unconstrained will of the testator, expresses his own voluntary wish and purpose, you must answer "No" to the third interrogatory. But if, on the other hand, you believe that the paper does not declare the free and unconstrained desire and intention of the testator, you will answer that interrogatory in the affirmative.

Gentlemen, the case is of importance, not only to the parties in litigation, but to every member of the community; because, on the one hand, it affects the right of a man to dispose of his property by will as he may see fit; and, on the other, it affects the interest of heirs and next of kin that they be not disappointed in their just expectations by an irrational or fraudulent disinheritance. Because of the great importance of the case, I beg and I believe that you will decide it without prejudice or partiality, and that you will be guided to your conclusion by no other motive than a desire to do justice according to the law and the evidence.

The jury found against the validity of the will.